Good morning. As it may please the Court, my name is John Ballas. I represent the appellant, Princeton Hummingway. I intend to reserve about five minutes for rebuttal. Mr. Blasius, before you get into the argument, who is your client? Princeton Hummingway. Have you talked to him? I have spoken with him by phone. Has he told you that he didn't want you to appear for him? Not when I spoke with him on phone, no. Are you aware of any filings in this Court in which he disavows an appointment of a public defender on his behalf? Yes. I mean, he has asked to represent himself on appeal. All right. I went to the commissioner. All right. The commissioner made a finding and recommendation to a motions panel of the Court. That's right? Yes. And Mr. Hummingway had 21 days in which to file an objection, right? Okay. And prior to the 21 days running, this Court entered an order appointing you as counsel, right? Okay. Is that due process of law? Not the way you describe it, no, Your Honor. All right. Then he asks again for your removal. And a motions panel of this Court treats it as a motion for reconsideration. It's never been really considered. So on this record, I just wonder if you feel comfortable appearing for Mr. Hummingway. You know, I haven't been. If you appeared amicus curiae on a court appointment, I'd understand it. Now, he's been a very difficult client. He was very difficult in front of the trial court. He's still difficult. And I am just trying to take any care and precaution I can, because I think your appointment is very shaky. Help me out. I think that a whole legitimate additional set of issues for the Court to consider is whether or not I was properly appointed, whether or not he should be permitted to represent himself. I'm not ñ I'm not ñ I really have not focused on those issues. I was not really aware of all the proceedings before he got appointed. I know generally what happened. I knew I got appointed. But I wasn't aware of that ñ of all the specifics in that sense. I wasn't focusing on that as a specific issue, that the Court was considering that as another issue. But I think that is something. I will ñ I will level with you. I put all of this together in the last few days. I became ñ I got a ñ I got a handwritten document. I don't know whether you got it or not. I've gotten some of his handwritten pleasures. He says in that document that complainant is appearing pro se in both the underlying criminal case and on the appeal. Now, he has a right to represent himself, as I see it, and I don't see an impediment to it. He's not ñ he's not in the loony bin. He's been ñ you know, the trial court went through the exercise with him on mental illness. So this is what he tells me, and I'm now aware of the documents, and that's why I raised the question. And I wasn't ñ I don't ñ I guess I wasn't served or given all the Court's orders in terms of prior to my appointment of counsel or the Court's denial of his request to represent himself. But I do think that that's a separate legitimate issue for the Court to consider on this appeal. I'm not ñ in light of the Court's comments, I'm not sure if you want me to proceed further. On the assumption, and I say assumption, on the assumption that you are representing him in this appeal or are providing us assistance as an amicus on this appeal, why don't we hear from you? And if we decide that he is entitled to represent himself, we will then, I guess, have to make arrangements so that he can represent himself in addition to whatever you might say. And, of course, if he cannot ñ if he can represent himself and you are not properly representing him, he would not be bound by anything that you say that might be adverse to him. That's fine. Anything that you can say that would be helpful to him, I think we would be interested in hearing. And I understand that counsel would not be appearing for free. He's still a CJA-authorized appointment at this point. And if the Court would ñ if the Court would desire any supplemental briefs or any comments on that issue, I would be more than happy to do that. And obviously, this is something that Judge Beezer has learned in the last few days, and we're still trying to figure out how to deal with it. Yes. Now, could we start the clock? I know you didn't start it because Judge Beezer said before we get going, but I think we have gotten going. Okay. Here we go. And you don't ñ you don't really have a full 20 minutes. Let's hear what you have to say, and then we'll go. You know, this always proves my thinking that you never know what to expect in any trial or argument. There's always something that comes up you don't expect. Can't say we didn't read the papers. And boring is banned. Okay. But you've handled it with aplomb. Today is not boring. Oh, thank you. Okay. I was intending to go down the issues in terms of first addressing the competency of Mr. Hummingway, then the Ferrara issue, and then briefly touching on sentencing. And I won't use all my time. I would like to reserve a few minutes for rebuttal. Say what you need to say. In terms of competency, the question is whether there's a serious doubt or reasonable doubt as to whether or not he was suffering from a mental illness or disease or defect, such that he was unable to understand the nature and consequences of the proceedings, or to assist in his defense. And the question is not whether he's not ñ he's competent or not, but whether or not the judge should have ordered a hearing. And I think we can quarrel over when the judge should have had a reasonable doubt or a serious doubt. But I think as the proceedings progressed all the way up until the trial, I think it was clear that there were serious doubts as to whether or not he's competent. And on September 26, 2001, the government's counsel asked the court, indicated that there may be some questions about competency, and said the defense requests that he ñ Mr. Hummingway asked his attorney to be fired raised a reasonable doubt as to his competency. The next day when they had a hearing in court, September 27, when Judge Levy asked Mr. Hummingway whether he understood the nature of the charges, he said his first answer was, I'm being accused of not being a U.S. citizen and not having legal status of being here in the United States. And that's nowhere in the indictment. There's nowhere in any of the charges or accusations against him. And it causes some concern. Then on October 18, 2001 hearing, Mr. Hummingway informs the court that he's been living in his car for the last two years. And he has ñ it's not only living in his car, but he has all his possessions in his car, his food, his clothing, all the production work for the movie he was producing. And he calls his car his companion, his life, et cetera. And I think that that alone is significant. It causes some concern about his mental state and his status, that he's living in this disorganized mass in his car. The judge also, as the proceedings go pretrial and at trial, indicate a number of times where he seems to be unable to answer the court's questions. Sometimes Judge Levy actually says that. You're not answering my question. You seem to have an inability to answer and calls them a nonlinear thinking. When Judge Levy asks one question, he goes off into some tangent. But it's also a sign of schizophrenia. At least it's one of the symptoms of disorganized speech. And I think even though ñ Be careful. We've had counsel argue before us who sometimes exhibit nonlinear thinking. Well, it's only one of the symptoms. Do you even have people on the bench who do that? You have to have at least two of the five criteria for diagnosis of schizophrenia. And by the time of trial, I think it was pretty obvious that there were some serious problems. He goes into this grandiose thinking and speech to the jury where he's talking about that he's defending the rights of the people. He talks about the poverty and homelessness in our society. In fact, he goes into talking about the atomic bombs in World War II, Kosovo, the Middle East problems. He goes all over in all kinds of different tangents. And I think no one really stopped and took a hard look as to whether or not they should have a hearing in terms of competency. And one final point on that. One of the things he said that the jury, when he's talking about the car, he goes into this little tangent about how he had seven or eight pairs of boots in his car. He indicates that he has one on now, the others he doesn't have. And he talks about the color of the boots and how it matches a suit he had. It's all kind of pretty unusual and potentially a sign of mental illness. With respect to the Ferretta issue, I think there's some, there was two colloquies. And just to make sure, before we move to Ferretta, obviously they're linked in some way, but you're saying that these are enough signs that Judge Levy, having seen this, should have ordered a professional mental examination. Yes. At some point in the process.  And I'm not, you know, you quibble over where, but I think at some point, yes, some point before. That's the argument. Okay. In terms of Ferretta, the initial colloquy was on February 6, 2002, and I think the judge was focused on a number of other things. There was some indication of a breakdown with counsel. The judge asked him about a number of things and kind of glossed over, in particular, the dangers and disadvantages of self-representation. He did tell Mr. Hummingway that he would not be able to, he's a neutral party, would not be able to assist Mr. Hummingway. He also talks about the rules of evidence, asked if he read them and he will need to read them. But he didn't go over in sufficient detail as he should have. The prosecutor in the case realized that there was a problem and asked the judge to give a supplemental advisement, which the Court did on April 11th. And I'm arguing that that advisement was insufficient for three reasons. One is that it occurred too late because the Court's cases specifically talk about a focus on when the decision was made to represent himself. That's when the defendant has to be aware and be advised of the dangers and disadvantages of self-representation. Second is that the answer itself that he gave after he was given this additional advisement indicates he didn't fully understand. When Judge Levy gave him the supplemental advisement this Court suggested in Hayes, Mr. Hummingway's response was, yes, I've read the rules of evidence, I've enjoyed that book, and I know who the prosecutor is. I think he's the first person who ever did enjoy that book. And then the Court goes on to a number of different issues and there wasn't really any additional discussion on that. And in that same hearing later on, the judge does make one other attempt to get Mr. Hummingway to have counsel. And he asked Mr. Hummingway if he would like to go back to his old counsel, and Mr. Hummingway says, I would have to represent myself. And I think one of the problems with the supplemental colloquy in the advisement was that Mr. Hummingway is under the impression that he had a choice of Mr. Zindel, the Assistant Federal Defender who was representing him, who he believed was dishonest, he said, since day one, or representing himself. And in that dilemma, he chose to represent himself. So I don't think it was a fully informed decision. With respect to sentencing, briefly, I think that the government's counsel is correct in the supplemental brief that as a result of Blakely, Ammaline, and the Court's Castro decision, that the proper approach is to remand for resentencing if the Court were to affirm the conviction. If the Court were to reverse the conviction, then we don't have to deal with the sentencing issues. But because Mr. Hummingway has already completed the sentence based on the jury's  the only part of the sentence that's left to serve is, I'll call it, the Blakely-vulnerable part of the sentence. Right. Yeah. Right. And my only other comment on sentencing is that in terms of, and I guess the Faretta incompetency are separate issues, but even if he was properly representing himself and even if he had properly been advised and there was a full hearing incompetency, I think at the point where he refused to represent himself anymore at sentencing, it would violate it. He should have, the Court should have appointed counsel to represent him at sentencing. Sentencing, especially under the guidelines, is particularly complex. It's not supposed to be a one-sided affair. The pre-sentence report in the case says that he spoke with the prosecutor, reviewed the government reports, talked to the agent, looked at the indictment. All the information in the pre-sentence report all comes from the prosecution viewpoint. And I think that under this Court's Mack decision that they had to do more with the trial, but I think the same principle applies with respect to sentencing. Thank you. And we'll go, sorry. I have one question. Did you receive an order filed in this Court on January 21st, 2004, that itemized the prior motions that Mr. Hemingway had filed with the Court? I'm not certain. You don't have your record there? Yes. It says that the Court was sending you a copy of the order. It reflects the fact that he had made motions pro se in this appeal. Have you had any communication with him? Yes. I spoke with him after about the time I made. I've had a lot of communication with him in writing. And much of our communication is him telling me there's been times where he says he wants to represent himself. He's continuing to fight to represent himself. I've received copies of some of the pleadings he's filing with the Court. Yes.  That sounds about right. And it's dated February 21st, March 7th, July 15th, August 15th, and December 11th, 2003. Weren't all those documents sent to you? Yes. You know, I do have the January 21st order I see in my file. So you had personal knowledge that he was objecting to appointment of counsel? Oh, yes. Okay. Thank you. Thank you. And you've got some time if we need rebuttal. Thank you. May it please the Court. Thomas Flynn for the United States. I'd like to just say a few words about this appointment of counsel. It's my understanding, Your Honor, excuse me, that he does not have a constitutional right to represent himself before this Court. I thought the Supreme Court recently straightened that out so that it is within unlike in the district court where he had an absolute right to represent himself, does not have an absolute right to represent himself before this Court. And does he have a right to deprive appointed counsel from representing him? I think this Court has. You can force an agency-attorney-client relationship upon a person over that person's objection? I believe that's what the Supreme Court said on appeal, Your Honor. You can't represent me in any litigation. Pardon? I mean, no court could appoint you to represent me in any litigation. That's correct. Not in the district court. Why can't the Court appoint somebody to represent him in his litigation? It's his case, not the lawyer's case. Well, I understand that, Your Honor. But I believe what the Supreme Court said is that appeals are different than trials and you do not have a right to represent yourself. You may have a right to a different attorney. You may be able to make that pitch to the Court, but I do not believe you have a right to represent yourself. But he asked that counsel be removed. Correct. And that he be allowed to represent himself. And this Court has just sort of muddled along with it and they don't rely on any constitutional principle. They don't cite any Supreme Court cases to him and they don't rely on any rules in their orders. They're just bald orders denied. Well, I have not seen any of those orders. And it's really ñ I just bring that up. This Court is sending you orders that they've entered in the case and they're sending to ñ I believe I received the orders. I've not seen any of the correspondence that he has been sending the Court. And you didn't ask ñ you heard about these five different matters that he described and that the Court sent to the opposing counsel but didn't send to you? No, I don't think I have, Your Honor. Okay. In a sense, this is not my ñ I'll defend against whoever represents him. I just wanted to ñ A process. I just wanted to bring this fact to the Court's attention. Do you have a case that you rely on that should control this matter, in your opinion? Well, it's the Supreme Court's case on representation. This threat on appeal, I could get it to the Court. I wasn't anticipating this. I don't have the name. Blocking the name for a minute. But I distinctly remember that case because it affected some of our procedures in this Court. Yes. Yeah. On the competency issue, I think what the defense is trying to do, and I don't think it's ultimately successful, is to take snippets of Mr. Hummingway's comments and turn them into characterizations of his competence. And I think that the district court and this Court can tell the difference between those little pieces of his conversation and his entire effect quite easily. For instance, the defense repeatedly refers to the colloquy where he says he's not a U.S. citizen, not his legal status. The district court observes, and it's correct, I mean, if you just simply read through that entire proceeding, and it's not very long, that what Mr. Hummingway is concerned about is his bail status. That's the thing he wants the most. He wants to get out. And he keeps bringing that up. And that's a justifiable concern of his. The district court keeps bringing up, no, we need to focus on what's before the court. And the rest of the conversation, almost the entire conversation that the defense does not refer to in its brief, has to do with what the charges are against him and what he has to defend against. And he understands those quite well. He defines a jury admirably, recognizes there might be a difference between the state court juries with which he's familiar and the federal juries with which he is not. He states that the indictment charges that he's defrauded these people of $200,000. He denies that that's the correct amount. He says that the indictment charges him with never having produced any films. He says that's incorrect. Everything except for those parts that the defense brings out are perfectly coherent. Even though he's not successful at the trial and he's not particularly organized, there's nothing in the trial proceedings that shows that he's in any way incompetent. You may have noticed that I included in the supplemental excerpts of record the entire cross-examination of a man named Leslie Houck, who was one of the people that Hummingway defrauded. And I think if you simply go through that, you'll see exactly how competent he was, not just mentally competent, there's no sign of any mental disease or defect, but actually reasonably successful in impeaching this man. Leslie Houck was one of the people who was giving Hummingway money. And here's how Hummingway's cross went. This starts in the supplemental excerpt of record, page 45. Hummingway brings out that Houck had made a lot of money from the coins that he had dealt with Hummingway before. Houck had invested $4,500 and had gotten a $6,000 return on that. He got him to admit that Houck understood that the film industry was a risky investment, that he had signed documents from Hummingway that those were risky investments, that the documents he'd signed on the second film, on which he didn't make any money, were identical to those that he had done on the first film, that Houck was aware that it was a risky venture. He'd had a lot of friendly conversations with Hummingway, that the name Princeton Hummingway or Arthur Goldenstein, the two names that Hummingway used, which name Hummingway used, Houck admitted wasn't important. What was important to Houck was the bottom line. At one point on page 70 and 71 of the supplemental excerpts, Houck says specifically that the bottom line is all that's important here. Hummingway gets him to admit that he never promised him when he would start getting interest, that Houck knew the difference between secured investments and unsecured investments like stocks, and that the films were more like the stocks, and that Houck was familiar with the movie business because his son-in-law was in the movie business, and that Houck had received descriptive literature about the project before he invested in it, and he knew exactly what it was about. It was going to be an epic about great Americans, the Civil War, and so on. Now, what turned out to be not a particularly successful defense, but I would point out that this whole idea that the investor knows that it's a risky investment. He knows that he's not being promised anything. He knows he can lose his investment. Most of the criminal defense attorneys I know who handle fraud cases, that's exactly how they impeach a witness in a case like this, by showing that he wasn't defrauded, and Mr. Hummingway did a very good job of it. These statements that the defense puts in the brief about atomic bombs and Hiroshima and all the rest of these things, they sound a little bizarre when you read them out of context, but when you read them in context, it makes quite a bit of sense. What Hummingway, perhaps misguidedly, we're not trying to say whether he was a good attorney here, we're trying to say whether he was mentally incompetent. He's portraying himself as an immigrant who had a difficult time in his own country, who was persecuted there, who came over here and is trying to live the American dream. It's the two Americas story. He sees and tries to characterize the prosecution as the kind of America that bombed Hiroshima, that committed atrocities in Kosovo, and he is aligning himself with George Washington, General MacArthur, and the people who try to make America great, and that he should not be punished for trying to produce movies that show what a great place America is. At one point, he says, this would have succeeded, except they arrested me. Again, that's sort of the standard defense in a lot of these white-collar cases is, I had a risky venture going here, I was taking in money, and I was just about to make it when the government arrested me, and the whole thing collapsed. So all I'm asking the court to do on the competency issue is to take those comments and read just a few pages before and after them, and I think it's quite clear that he's not mentally incompetent. He is doing the best he can to represent himself, which is what he wants to do. The government also thinks that a couple of the statements, assuming they're characterizations that the defense makes about things, are not justified. For instance, Mr. Ballas just referred to the disorganized mass in the defendant's car. Well, if you read, again, the two or three pages around that quote, the defendant never says it's a disorganized mass. He said he was living in his car because he was so devoted to making these movies that he had put everything he had into it, he'd run out of money, and that he had been forced to move out of his house and live in his car. But he was so determined to make that movie that he was going to live that way if he had to. And the comments about the boots, he also mentions he has a bunch of silk jackets in there, he's simply explaining that I had to keep meeting with movie producers and I had to eat in nice restaurants and I had to convince these people that I was still worth supporting. So what did I do? I kept six pairs of boots, I think it was, six silk jackets. I shaved every day, I showered every day, I was clean, and I needed to keep all of my materials together so that I could present it to these people. I was doing all of this so that I could continue this project. I think I'm ready to acquit. I think, Your Honor, that shows that he was not only competent, he was a good attorney. The point just is that I think that the comments that the defense is bringing up are taken out of context. Did he testify? Pardon? Did Hummingway testify himself? Yes, he did. That's another thing about this. The context that you're giving us is in the record. Absolutely. That's his affirmative. That's his defense. That came out of his own mouth, not implicit in how you're reading what he said. No. If you read his opening statement, if you read his closing statement, if you read his testimony, if you read his cross-examination of the witnesses, this is his pitch, this is his story. It didn't work, but it certainly makes sense. You've got one vote on the three in Nigeria. On the advisement of rights issue, I think that the cases, even the Supreme Court's recent decision in Iowa versus Tovar, they point out that what you really want the district judge to do is not just read a blanket advisement like in Hayes. Well, in Hayes, as I recall, wasn't intended to be. It was supposed to organize the presentation, but it's explicit, saying you don't have to read it verbatim. Exactly. But, unfortunately, I think the downside of that, like any hard and fast rule, is that judges will start to do that. Judge Levy did not. It's better than what we were getting before, let me tell you, where there were big gaps in the record. Yes. But I think in this case, what Judge Levy did is he tried to tailor his advisement to the person he had in front of him. And now he's being charged with not having read that, even though, as Your Honor said, it doesn't say you have to read that. Here are the things that Judge Levy told him. You can't rely on pro bono representation. You're going to have to represent yourself. You're going to need to comply with the court dates with no help from anybody. You don't have a legal education. You are not familiar with the federal rules of evidence, which you're going to have to follow. You have gone through a trial before, so you think you know some things. But it also came out that that was a state court trial, not a federal trial, that this is a complicated case. It's a fraud case. It's a long indictment. The jury instructions will be complicated. There are thousands of pages of discovery. There's a lot of tapes you're going to have to review, and that you're going to have a lot of difficulty because you are in confinement. He was not out. You're not going to be able to go to the library easily and do all of these things. And what does the defendant say? Under those circumstances, this is a quote from Hummingly, under those circumstances for me to represent myself is not going to be an easy matter. The court has, I mean, that's certainly, with all due respect to Judge Fischer, I think that's a better explanation to this individual in his circumstances. I wasn't suggesting otherwise. We're just saying that Hays was intended to help district judges who were being too succinct or incomplete to give them a sense of what would be helpful to us sitting on appeals, so we didn't have to find and go through long arguments explaining why the defendant had in essence been given all the information. I'm not suggesting anything about Judge Levy in this case. That's for later decision. Right. Well, I'm just thinking that what Judge Levy did was exactly what a judge is supposed to do. He looked at this defendant, explained to him what his problems were going to be, told him many times not to do this, and the defendant insisted. But he also offered him standby counsel. He did. And I would like. And granted continuances. I may have misunderstood what Mr. Ballas said, but I don't think it's true that at the end of the second advisement that he didn't offer him a chance to continue to represent himself, because at the end of this, this is on page 34 of the supplemental excerpt, now that you see what has to be done to prepare a case for trial, it's a lot of work. Are you prepared to do that work and represent yourself, or do you want me to ask Mr. Zindel to come back and represent you, Mr. Hummingway? I would have to continue representing myself. That seems pretty unequivocal. Now, Mr. Ballas suggests that he wasn't given the opportunity to have somebody other than Mr. Zindel come back. But the truth of the matter is that at the beginning, when the judge asked him, do you want somebody other than Mr. Zindel, Hummingway said, no, that wouldn't be fair to Mr. Zindel. I want to represent myself, but, you know, I'll have him back now and I'll decide about it. But at no point up until then had he said, I want somebody else. He had always talked about it. He had accepted Mr. Zindel as his standby counsel. Judge Levy had no occasion to recommend anybody else. That was always the option, Mr. Zindel or yourself. The fact that the prosecutor asked for this supplemental advisement, this is sort of the damned if you do, damned if you don't situation. You become aware that the court has set something out. You ask the court to do it, and it does. And then later on it's pegged as, well, see, you knew the first one was no good and you're trying to fix it. I think it's quite clear from the pleadings that were filed it's not what happened. This was just overcautious, if anything. The last thing I would like to say is this is about the criminal history and counsel at sentencing. The defense seems to imply, and this goes to what Judge Beezer said earlier, that the district court could have forced counsel on Hummingway at sentencing. I think that's simply not the law. In fact, there's a case that I'm actually embarrassed that I found this in the case that the defense cited. They cite to the Seventh Circuit Brock case, which refers to a Ninth Circuit case called Fluitt, F-L-E-W-I-T-T, which says exactly that. In Fluitt, the district court said that the defendants who were representing themselves weren't doing a good job and that he was going to relieve them of their pro se representation and have counsel take over for them. And this court reversed, saying that you have a right, as long as you're competent, you have a right to represent yourself no matter how bad a job you do. And the distinction is between the cases that the defense cites and the cases in this situation here is that in those cases where the defendant is acting out and the district court relieves him to preserve order for the court, the situation here is that the defendant gets to choose. He's not acting out. He's not being relieved of it because he's incapable of it. He just chooses not to participate. And that's his choice. It's a bad choice, obviously, but it is his choice. And I don't believe the district court had the authority to relieve him. Finally, on the criminal history, the defense brief makes the point that there's no evidence in the record that the defendant was committing this fraud while he was still on probation. I'd like to point to the reporter's transcript of pages 74 to 98, government's exhibits 16, 17, 18, 19, and 20, all of which are dated in June of 93, eight months before the defendant's probation ended, in which he's signing subscription agreements with Mr. Hummingway and giving him checks. Now, pardon me. I'm not sure. I don't know you can help educate me now. Does this go to a sentence enhancement? But not a Blakeley one, Your Honor, because it involves his criminal history. Okay. Unless the court has any questions. Do you agree, though, that with regard to any of the ñ there are enhancements that are Blakeley-related, right? There are. And those ñ I understand both counsel agrees would have to be remanded under a Castro. Yes. I believe I pointed out that in the supplemental filing that in Castro the court talked about remanding it for release and that. That's already been done. Mr. Ballas made a bail motion, and Judge Levy denied it pending Mr. Ballas' finding a place to stay. So that part is already ñ but actually considering those issues that have to be done in the district court, yes. Thank you. Mr. Ballas. Starting with the last point first, I don't think the bail issue is necessarily a done deal. At the time we made the bail motion, the court had not even accepted my supplemental brief yet on Blakeley issues, and the judge indicated it may not even be able to raise the issues, and we had discussion on a number of different points. There was no placement for Mr. Hummingway at that time. Since he has no money, he would be homeless. The court did not permit him release on bail. But I think the bail is an appropriate issue for either this court or the district court to consider. He is going to be finished with his sentence in January under the ñ if the ñ under Blakeley, if some of the enhancements were erroneously applied, he was already timed out in essence. With respect to the ñ Do you think his release date is January 05? That's the latest from the Bureau of Prisons. What would be the earliest as you compute it? I think it's January 2005. It changes because sometimes the custody credits or if there's a disciplinary problem, he may lose some good time credits, et cetera. I took a note in reading the briefs that it's ñ I thought it was either 11-22-04 or 12-30-04 for release. Well, here's the reason of that. In my ñ basically, I think both sides are going to the Bureau of Prisons' website, and it gives a projected release date. When I did my opening brief, it said November 2004. When the prosecutor did his brief, it said December 2004. The current one says January 2005. What's he getting more time for? I'm assuming ñ I'm not sure, but I'm assuming he is losing some of his possible good time credits, because that release date is a projected release date that assumes he gets all of his good time credits. Okay. But they readjust that over time, and I'm assuming he's lost some. Okay. But I do kind of strongly disagree with the prosecutor, though, with respect to Mr. Hummingway's conduct here seems to me to be completely the same as the situation that Feretta in this Court's Mack decision described, where someone completely refuses to participate in the procedure in sentencing. It's the same thing as serious obstruction conduct acting out in court. Both times they're a conscious decision to do something that prevents the functioning of the court in the rational way it should be. And the fact that someone, instead of acting out and causing a big commotion, instead goes to the corner and refuses to participate is, in my view, the exact same thing. And at that point, the court should revoke his right to represent himself and appoint counsel to represent him. And just briefly on the competency issue, I think the prosecution overemphasizes or overexaggerates his effectiveness at trial, Mr. Hummingway. A couple points I'd like to point out is Judge Levy himself said that once during a two-hour cross-examination, he made about three relevant questions. And I think it's also true that a lot of people that are serving, suffering from mental illness, do not want to be labeled mentally ill. They learn to cope with people in society. They learn to put on a veil, an appearance that they're rational, at least during some sense. But I think if you look at the overall record here, everything, the way it adds up, there was at least a doubt, a serious doubt, as to whether or not he was competent. And the district court should have had a hearing. And the district court should have had a hearing.  judge was able to make a decision. And because of that, the court should vacate the judgment of conviction and sentence. Okay. Thank you very much. Thank you, both counsel, for extremely helpful argument. One for sure getting paid, and you darn well get paid. You both were very helpful. And whether or not you're actually representing Mr. Hummingway, you did a very nice job on his behalf. Mr. Hummingway may not agree, but thank you. Thank both of you. The case of the United States v. Hummingway is now submitted for decision. And if we need further from counsel, we'll let you know. Thank you.
judges: Beezer, W. Fletcher, Fisher